AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

FILED
RICHARD W. NAGEL
CLERK OF COURT
7/27/20

for the

Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

MeWe accounts associated with the email addresses t6200081@gmail.com and wbob27283@gmail.com that is stored at premises controlled by Sgrouples Inc.

)
)
)
)
)
)

Case No.

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON
3:20MJ346

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A-1

located in the ____Northern____ District of ____California____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| SEE ATTACHMENT C-1 | |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrea R. Kinzig, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

____Telephone_____ *(specify reliable electronic means).*

Date: ____7/27/20_____

_____

City and state: ____Dayton, OH_____

Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

Information associated with the MeWe accounts associated with the email addresses

**t6200081@gmail.com** and **wbob27283@gmail.com** that is stored at premises owned,

maintained, controlled, or operated by Sgrouples Inc., doing business as (dba) MeWe, a company

that accepts service of legal process at 801 California Street, Mountain View, California, 94041.

## ATTACHMENT B-1

### Particular Things to be Seized

**I.      Information to be disclosed by Sgrouples Inc. (the "Provider")**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, including any e-mails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, passwords, security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other MeWe activities.

(c)      All photographs and videos uploaded by the user and all photographs and videos uploaded by any other user that have the user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photographs and videos.

(d)      All profile information; timeline information; videos, photographs, articles, and other items; all Contact lists, including the Contacts' MeWe user identification numbers; groups and networks of which the user is a member, including the groups' MeWe group identification numbers; future and past event postings; rejected Contact requests; comments; tags; and other information about the user's access and use of MeWe applications.

(e)      All records or other information regarding the devices and Internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string.

(f)      All other records and contents of communications and messages made or received by the user, including all chat communication activities, private messages, chat histories, video and voice calling histories, and pending "Contact" requests.

(g)      All IP logs, including all records of the IP addresses that logged into the account.

(h)      All records of the account's feedback to MeWe posts.

(i)      All information about the MeWe pages that the account followed.

(j)      All past and present lists of Contacts created by the account.

(k)      All records of MeWe searches performed by the account.

(l)      The length of service (including start date), the type of services utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number).

(m)      All privacy settings and other account settings, including privacy settings for individual MeWe posts and activities.

(n)     All records pertaining to communications between MeWe and any person regarding the user or the user's MeWe account, including contacts with support services and records of actions taken.

(o)     Any other MeWe accounts associated with the listed accounts by cookies, recovery email address, or telephone number.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant. Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the Provider shall disclose responsive data by sending it to the Federal Bureau of Investigation at 7747 Clyo Road, Centerville, Ohio, 45459.

## II.     Information to be seized by the government

Items evidencing violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1) and 2252A(a)(5)(B) and (b)(1) (possession of child pornography); and 18 U.S.C. §§ 2252(a)(2)(B) and (b)(1) and 2252A(a)(2) and (b)(1) (receipt and distribution of child pornography); from January 1, 2019 through the present, including but not limited to the following:

1.     Any visual depictions and records related to the possession, receipt, and distribution of child pornography.

2.     Any visual depictions of minors, and any identifying information for these minors.

3.     Any communications with others in which child exploitation materials and offenses are discussed and/or traded.

4.     Any communications with minors, and any identifying information for these minors.

5.     Evidence of utilization of email accounts, social media accounts, online chat programs, and peer-to-peer file sharing programs.

6.     Evidence of utilization of telephone accounts;

7.     Any information related to Internet Protocol (IP) addresses accounts accessed by the accounts.

8.     Any information related to the use of aliases.

9.     Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts.

## **ATTACHMENT C-1**

Code Section                                Offense Description

18 U.S.C. §2252(a)(4)(B) & (b)(1)           Possession of Child Pornography

18 U.S.C. §2252A(a)(5)(B) & (b)(1)          Possession of Child Pornography

18 U.S.C. §2252(a)(2)(B) & (b)(1)           Receipt and Distribution of Child Pornography

18 U.S.C. §2252A(a)(2) & (b)(1)             Receipt and Distribution of Child Pornography

## **AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

I, Andrea R. Kinzig, being duly sworn, depose and state the following:

## **INTRODUCTION**

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 2005. I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office. In connection with my official duties, I investigate violations of federal criminal laws, including offenses pertaining to the illegal production, distribution, receipt, and possession of child pornography (in violation of 18 U.S.C. §§ 2252(a) and 2252A). I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media, including computer media.

2. Along with other agents, officers, and investigators of the FBI and Preble County (Ohio) Sheriff's Office, I am currently involved in an investigation of child pornography and child exploitation offenses committed by an individual utilizing the user names of David Dixon, David Dickson, David Jackson, Juan Lesstime, Juan Goodtime, Juan Twothree, Haywood Jablome, Captain Obvious, Juan Lastime, and Juan Motime on email and social media applications. This Affidavit is submitted in support of Applications for search warrants for the following:

   a. Information associated with the MeWe accounts associated with the email addresses **t6200081@gmail.com** and **wbob27283@gmail.com** that is stored at premises controlled by Sgrouples Inc., doing business as (dba) MeWe (as more fully described in Attachment A-1);

   b. Information associated with the Google accounts **t6200081@gmail.com** and **wbob27283@gmail.com** that is stored at premises controlled by Google LLC (as more fully described in Attachment A-2);

   c. Information associated with the Instagram account associated with the email address **southernman4501@gmail.com** and/or the account name of **southernman4501** that is stored at premises controlled by Facebook Inc. (as more fully described in Attachment A-3);

   d. Information associated with the Snapchat account containing the user name **abalderson1** that is stored at premises controlled by Snap Inc. (as more fully described in Attachment A-4);

1

e.      Information associated with the cellular telephone assigned call number **240-609-9375** that is stored at premises controlled by AT&T (hereinafter referred to as the "**TARGET CELL PHONE**" and as more fully described in Attachment A-5); and

f.      Information associated with the Instagram account associated with the email address **southernman4501@gmail.com** that is stored at premises controlled by Facebook Inc. (as more fully described in Attachment A-6).

3.      The purpose of the Applications is to search for and seize evidence of suspected violations of the following:

a.      18 U.S.C. §§ 2252(a)(4)(B) and (b)(1) and 2252A(a)(5)(B) and (b)(1), which make it a crime to possess child pornography; and

b.      18 U.S.C. §§ 2252(a)(2)(B) and (b)(1) and 2252A(a)(2) and (b)(1), which make it a crime to distribute and receive child pornography through interstate commerce.

4.      The items to be searched for and seized are described more particularly in Attachments B-1 through B-6 hereto and are incorporated by reference.

5.      As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other agents, officers, and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

6.      This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the searches of the above noted accounts (as described in Attachments A-1 through A-6).

7.      As a result of the instant investigation described more fully below, there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law; including violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1), 2252A(a)(5)(B) and (b)(1), 2252(a)(2)(B) and (b)(1), and 2252A(a)(2) and (b)(1), are present in the information associated with the above noted accounts (as described in Attachments A-1 through A-6).

## JURISDICTION

8.      This court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PERTINENT FEDERAL CRIMINAL STATUTES

9.      18 U.S.C. § 2252(a)(2)(B) states that it is a violation for any person to knowingly receive or distribute any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, shipped, or transported in or affecting interstate or foreign commerce or which contains materials which have been mailed or so shipped or transported by any means, including by computer, or to knowingly reproduce any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

10.     18 U.S.C. § 2252A(a)(2) states that it is a violation for any person to receive or distribute – (A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; and (B) any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

11.     18 U.S.C. § 2252(a)(4)(B) states that it is a violation for any person to knowingly possess, or knowingly access with the intent to view, one or more matters which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

12.     18 U.S.C. § 2252A(a)(5)(B) states that it is a violation for any person to knowingly possess, or knowingly access with intent to view, any book, magazine, periodical, film, videotape, computer, disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, that was produced using materials that have been mailed,

or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## BACKGROUND INFORMATION

### Definitions

13. The following definitions apply to this Affidavit and Attachments B-1 through B-6 to this Affidavit:

    a.    "**Child Pornography**" includes the definition in Title 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

    b.    "**Visual depictions**" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image (see 18 U.S.C. § 2256(5)).

    c.    "**Minor**" means any person under the age of eighteen years (see 18 U.S.C. § 2256(1)).

    d.    "**Sexually explicit conduct**" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person (see 18 U.S.C. §§ 2256(2) and 1466A(f)).

    e.    An "**Internet Protocol address**", also referred to as an "**IP address**", is a unique numeric address that computers or electronic devices use in order to communicate with each other on a computer network utilizing the Internet Protocol (IP) standard. Every computer or device connected to the Internet is referenced by a unique IP address. An IP address can be thought of as the equivalent to a street address or a phone number, just as each street address and phone number uniquely identifies a building or telephone. IP addresses are composed of four sets of digits known as "octets," ranging in value from 0-255, separated by decimal points. An example of an IP address is 192.168.10.102. There are two types of IP addresses; static and dynamic. A static address is permanently assigned to a particular device and as a practical matter never changes. A dynamic address provided by an Internet service provider to a client computer is valid only for the

4

duration of the session that the client computer is connected to the Internet (or other network).

f.  **"Hyperlink"** (often referred to simply as a "link") refers to a navigation element in a web page or document that automatically brings the referred information (a.k.a. "resource") to the user when the navigation element is selected by the user. Hyperlinks are part of the foundation of the World Wide Web, but are not limited to a website for HTML.

g.  **"Website"** consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

h.  **"Uniform Resource Locator"** or **"Universal Resource Locator"** or **"URL"** is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

i.  **"Social Media"** is a term to refer to websites and other Internet-based applications that are designed to allow people to share content quickly, efficiently, and on a real-time basis. Many social media applications allow users to create account profiles that display users' account names and other personal information, as well as to exchange messages with others. Numerous forms of social media are presently available on the Internet.

j.  The terms **"records,"** **"documents,"** and **"materials,"** as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic

5

notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

Background on Computers and Child Pornography

14. Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

15. Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

16. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

17. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and

6

then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

18. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

19. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

20. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## Collectors of Child Pornography

21. Based upon my knowledge, training, and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the collection of child pornography (hereafter "collectors"):

a. Collectors may receive sexual stimulation and satisfaction from contact with children, or from having fantasies of children engaged in sexual activity or suggestive poses, or from literature describing such activity.

b. Collectors may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Collectors typically use these materials for their own sexual arousal and gratification. Collectors often have companion collections of child erotica. Child erotica are materials or items that

7

are sexually suggestive and arousing to pedophiles, but which are not in and of themselves obscene or pornographic. Such items may include photographs of clothed children, drawings, sketches, fantasy writings, diaries, pedophilic literature and sexual aids.

c.  Collectors who also actively seek to engage in sexual activity with children may use these materials to lower the inhibitions of a child they are attempting to seduce, convince the child of the normalcy of such conduct, sexually arouse their selected child partner, or demonstrate how to perform the desired sexual acts.

d.  Collectors almost always possess and maintain their "hard copies" of child pornographic images and reference materials (e.g., mailing and address lists) in a private and secure location. With the growth of the Internet and computers, a large percentage of most collections today are in digital format. Typically these materials are kept at the collector's residence for easy access and viewing. Collectors usually place high value on their materials because of the difficulty, and legal and social danger, associated with acquiring them. As a result, it is not uncommon for collectors to retain child pornography for long periods of time, even for years. Collectors often discard child pornography images only while "culling" their collections to improve their overall quality.

e.  Collectors also may correspond with and/or meet others to share information and materials. They may save correspondence from other child pornography distributors/collectors, including contact information like email addresses, and may conceal such correspondence as they do their sexually explicit material.

f.  Collectors prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.  Subscribers to websites that are primarily designed to provide child pornography have a strong likelihood of being collectors of child pornography. This high degree of correlation between subscription and collection behavior has been repeatedly confirmed during several recent nationwide law enforcement initiatives.

### Google Services

22.  Google LLC is a multi-national corporation with its headquarters located in Mountain View, California. The company specializes in Internet-related products and services, including an Internet search engine (www.google.com), productivity tools such as email service (gmail), and enterprise products such as Google Search Appliance.

23.     Google Photos is a photograph and video sharing and storage service provided by Google LLC, located at photos.google.com. It allows users to back-up their photographs and videos so they can be accessed on any telephone, tablet, or computer. It also allows users to pool their photographs and videos together with others into shared albums. Photographs and videos can be organized and searched by places and things in them.

24.     Google+ is a social networking and identity service website owned and operated by Google LLC, located at www.plus.google.com. Common features include the following:

     a.     <u>Profiles</u>: Users can establish profile pages to maintain personal information, similar to the Facebook and MySpace social networking sites.

     b.     <u>Circles</u>: Google+ allows users to establish "circles", which enables them to organize people into groups for sharing across various Google products and services. This service replaces the typical "Friends" list function used by sites such as Facebook and MySpace.

     c.     <u>Communities</u>: Communities allow users with common interests to communicate with each other.

     d.     <u>Photos</u>: Google+ allows users to post, back-up, and share photographs. Users can also make comments on photographs posted by other users.

     e.     <u>Hangouts</u>: Hangouts are places used to facilitate group video chat. Only Google+ users can join such chats.

     f.     <u>Messenger</u>: Messenger is a feature available to Android, iPhone, and SMS devices for communicating through instant messaging within Circles.

25.     Google Web and App History is a feature of Google Search in which a user's search queries and results and activities on other Google services are recorded. The feature is only available for users logged into a Google account. A user's Web and App History is used to personalize search results with the help of Google Personalized Search and Google Now.

26.     Google Drive is a file storage and synchronization service provided by Google LLC, located at www.drive.google.com. This service provides cloud storage, file sharing, and collaborative editing capabilities. It offers 15 GB of online storage space, which is usable across Google Drive, Gmail, and other Google services.

27.     Google Android Backup is a service provided by Google LLC to backup data connected to users' Google accounts. The service allows users to restore data from any Google

account that has been backed up in the event that the users' devices are replaced or erased. Data that can be backed up includes Google Calendar settings, WiFi networks and passwords, home screen wallpapers, Gmail settings, applications installed through Google Play, display settings, language and input settings, date and time, and third party application settings and data.

### Email Accounts

28.     Google LLC allows subscribers to obtain email accounts at the domain name gmail.com, like the accounts listed in Attachment A-2. Subscribers obtain accounts by registering with Google LLC. During the registration process, Google LLC asks subscribers to provide basic personal information. Therefore, the computers of Google LLC are likely to contain stored electronic communications (including retrieved and unretrieved email for Google LLC subscribers) and information concerning subscribers and their use of Google LLC services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

29.     In general, an email that is sent to a Google LLC subscriber is stored in the subscriber's "mail box" on Google LLC's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google LLC's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google LLC's servers for a certain period of time.

30.     Google LLC subscribers can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google LLC. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

31.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

32.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

33.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

34.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a

11

crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## MeWe

35.     Sgrouples Inc., dba MeWe, is a company based in Mountain View, California. Sgrouples Inc. owns and operates the MeWe website, which is a free-access social networking website that can be accessed at http://mewe.com. MeWe allows its users to establish accounts with MeWe, and users can then use their accounts to share photographs, videos, documents, voice messages, chats, GIFS[1], memes[2], and other information with other MeWe users. MeWe users can see posts, chats, comments, etc. made by individuals, pages, and groups with whom they are connected.

36.     MeWe asks its users to provide basic contact and personal identifying information, either during the registration process or thereafter. This information may include the user's full name, date of birth, gender, contact e-mail address, MeWe passwords, physical address, telephone numbers, screen names, websites, and other personal identifiers. MeWe also assigns a user identification number to each account.

37.     MeWe users may join one or more groups or networks to connect and interact with other users. MeWe assigns a group identification number to each group. A MeWe user can also connect directly with individual MeWe users by sending a "Contact Request". If the recipient of a "Contact Request" accepts the request, then the two users will become "Contacts" for purposes of MeWe and can exchange communications or view information about each other. Each MeWe user's account includes a list of that user's "Contacts".

38.     MeWe users can select different levels of privacy for their communications and the information associated with their MeWe accounts. By adjusting these privacy settings, a MeWe user can make information available only to himself or herself or to particular MeWe users. A MeWe user can also create "lists" of MeWe contacts to facilitate the application of these privacy settings. MeWe accounts also include other account settings that users can adjust, such as the types of notifications they receive from MeWe.

39.     MeWe users can create profiles that include photographs, lists of personal interests, and other information. MeWe users can also post links to videos, photographs, articles, and other items available elsewhere on the Internet. MeWe users can post information about upcoming "events", such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Timeline", which is a

---

1 A GIF is an image that has been encoded using the graphics interchange format, where it has multiple frames encoded into a single image file. A web browser or other software will play those images back in an animated sequence automatically.

2 A meme is an idea, behavior, or style that spreads by means of imitation from person to person within a culture – often with the aim of conveying a particular phenomenon, theme, or meaning represented by the meme. An Internet meme is a type of meme which is spread, often through social media platforms, via the Internet.

space where the user and his or her "Contacts" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

40.     MeWe allows users to upload photographs and videos to their accounts. These files may include metadata such as the user's location when he or she uploaded the photographs and videos. MeWe also provides users with the ability to "tag" (i.e., label) other MeWe users in photographs and videos. When a user is tagged in a photograph or video, he or she receives a notification of the tag and a link to see the photograph or video. For MeWe's purposes, the photographs and videos associated with a user's account will include all photographs and videos uploaded by that user that have not been deleted, as well as all photographs and videos uploaded by any other user that have that user tagged in them.

41.     MeWe users can exchange private messages on MeWe with other users. These messages are stored by MeWe unless deleted by the user. MeWe users can also post comments on the MeWe profiles of other users or on their own profiles, and such comments are typically associated with a specific posting or item on the profile.

42.     If a MeWe user does not want to interact with another user on MeWe, the first user can "block" the second user from seeing his or her account.

43.     MeWe allows users to give positive feedback or connect to particular pages. MeWe users can also follow particular MeWe pages.

44.     MeWe has a search function that enables its users to search MeWe for keywords, usernames, or pages, among other things.

45.     MeWe retains IP logs for a given user ID or IP address for 30 days. These logs may contain information about the actions taken by the user ID or IP address on MeWe, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a MeWe profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

46.     Social networking providers such as MeWe typically retain additional information about their users' accounts, such as information about the length of service (including start dates), the type of services utilized, and the means and source of any payments associated with the service (including any credit card or bank account numbers). In some cases, MeWe users may communicate directly with MeWe about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers such as MeWe typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

47. MeWe maintains records that may reveal other accounts accessed from the same electronic device, such as the same computer or mobile phone, and accounts that are linked by "cookies" (small pieces of text sent to the user's Internet browser when visiting websites).

48. The computers of MeWe are likely to contain all of the material detailed above, including stored electronic communications and information concerning subscribers and their use of MeWe, such as account access information, transaction information, and account application.

Snapchat Accounts

49. Snapchat is a social media communication application owned by Snap Inc., a company based in Santa Monica, California. The application is available on cellular telephones and tablets. The application provides a means to send and receive "self-destructing" messages, pictures, and videos.

50. A "snap" is a picture or video message taken and shared with other Snapchat users in real-time. The sender of a snap has the option of setting a timer for how long a snap can be viewed. Once a snap has been viewed, it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and receiver will no longer be visible. The application notifies other users when they are online so they can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitute "electronic communications" within the meaning of 18 U.S.C. § 3123. See 18 U.S.C. §§ 3127(1) and 2510(12).

51. A user can type messages and send photos, videos, audio notes, and video notes to friends within the Snapchat application using the "Chat" feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat application itself, a user can opt to save part of the Chat by tapping on the message that he or she wants to keep. The user can clear the message by tapping it again.

52. "Our Stories" is a collection of user-submitted "Snaps" from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at an event could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story.

14

53.     In addition to "Our Stories", a Snapchat user can keep a sort of photo / video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

54.     "Snapcash" in an online money transfer service offered by Snapchat. The actual business platform is run by "SquareUp", the distributor of a mobile credit card reader and application Square Register. Snapcash can be used to transfer money between Snapchat users using a linked, U.S.-issued Visa or MasterCard debit card only. Snapcash can only be sent to other users who have a linked debit card. Snapcash has a $250 weekly limit but can be upgraded to a $2,500 weekly limit. Users who upgrade have to provide their full name, date of birth, and Social Security Number.

55.     Snapchat has a "Group Stories" feature that allows multiple users to contribute photos and videos to the same "Story", a collection of posts that stays viewable for a limited amount of times. Snapchat users can name their group story and invite other users and "friends" by user name to add content. The Group Stories will disappear if 24 hours pass without a user adding a new photo or video.

56.     "Memories" is a cloud-storage service provided by Snapchat. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Snapchat's Memories. A user can also edit and send Snaps and create Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by Snapchat and may remain in Memories until deleted by the user.

57.     Snapchat asks users to provide basic contact and personal identifying information when registering their accounts, to include date of birth. When a user creates an account, he/she creates a unique Snapchat user name. This is the name visible to other Snapchat users. An email address is required to register a Snapchat account, and a new user must also provide a mobile telephone number. This telephone number is verified during the registration process. Snapchat sends an activation code to the telephone number that must be entered before proceeding with the registration step. However, a user may elect to bypass entering a telephone number, so one may not always be present in the user's account. Snapchat also retains the account creation date.

58.     While a Snapchat message may disappear, the record of who sent it and when it was sent still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status

including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

59.     Snapchat stores device information such as the model, operating system, operating system version, mobile device telephone number, and mobile network information of devices used in conjunction with the service. Snapchat also collects unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event that the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

60.     If a user consents, Snapchat can access his/her device's electronic phone book or contacts list and images.

61.     Snapchat retains information about the method and source of payment of customers who use the Snapcash service. This includes debit card information such as the card number, expiration date, CVV security code, and billing address zip code. Additionally, the company may have the date of birth and Social Security Number of those involved in money transfers. Snapcash generates a receipt for any transactions. The receipts are programmed to automatically delete after the sender and recipient have seen the message and swiped out of the Chat screen, unless either taps to save the message. Snapchat maintains transactional records for ten days. These records include information about the sender and receiver, the transaction amount, and the date/time stamps of when the message was sent, received, and opened.

62.     Snapchat deletes a snap once it had been viewed. If the message is not read because the user has not opened up the application, the message is stored for 30 days before being deleted. However, just because the snap no longer appears to the user does not necessarily mean they are gone. For example, Snapchat has a feature called Replay. This allows users to view a previously viewed snap once per day. This feature is disabled by default and the user must opt-in to use Replay. Also, if a Snapchat user posts an image or video to the MyStory feature, it can be viewed by their friends for 24 hours. If the users posts to the Our Stories feature, the snaps are archived and can be viewed through Snapchat.

63.     Therefore, the computers of Snap Inc. are likely to contain the material described above, including stored electronic communications and information concerning subscribers and their use of Snapchat (such as account access information, transaction information, and account application).

Instagram

64.  Instagram operates a photo and video sharing networking service located at
     http://www.instagram.com.  Instagram is owned by Facebook Inc.  Instagram allows its
     users to create their own profile pages, which can include a short biography, a photo of
     themselves, and other information.  Users can access Instagram through the Instagram
     website or by using a special electronic application ("app") created by the company that
     allows users to access the service through a mobile device.

65.  Instagram permits users to post photos to their profiles on Instagram and otherwise share
     photos with others on Instagram, as well as certain other social-media services, including
     Flickr, Facebook, and Twitter.  When posting or sharing a photo on Instagram, a user can
     add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a
     user made add the tag #vw so that people interested in Volkswagen vehicles can search
     for and find the photo); location information; and other information.  A user can also
     apply a variety of "filters" or other visual effects that modify the look of the posted
     photos.  In addition, Instagram allows users to make comments on posted photos,
     including photos that the user posts or photos posted by other users of Instagram.  Users
     can also "like" photos.

66.  Upon creating an Instagram account, an Instagram user must create a unique Instagram
     username and an account password.  This information is collected and maintained by
     Instagram.

67.  Instagram asks users to provide basic identity and contact information upon registration
     and also allows users to provide additional identity information for their user profile. This
     information may include the user's full name, email addresses, and phone numbers, as
     well as potentially other personal information provided directly by the user to Instagram.
     Once an account is created, users may also adjust various privacy and account settings for
     the account on Instagram.  Instagram collects and maintains this information.

68.  Instagram allows users to have "friends," which are other individuals with whom the user
     can share information without making the information public.  Friends on Instagram may
     come from either contact lists maintained by the user, other third-party social media
     websites and information, or searches conducted by the user on Instagram profiles.
     Instagram collects and maintains this information.

69.  Instagram also allows users to "follow" another user, which means that they receive
     updates about posts made by the other user.  Users may also "unfollow" users, that is,
     stop following them or block the, which prevents the blocked user from following that
     user.

17

70. Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

71. Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

72. Users on Instagram may also search Instagram for other users or particular types of photos or other content.

73. For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

74. Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram. For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

75. Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

76. Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

77. Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

78. As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time. Further, Instagram account activity can show how and when the account was accessed or used. For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation. Additionally, Instagram builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner. Last, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation. For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

<u>Facebook</u>

79.   Facebook Inc. is a company based in Menlo Park, California. Facebook Inc. owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

80.   Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact email addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

81.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each

19

other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

82. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

83. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

84. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

85. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

20

86.　If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

87.　Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

88.　Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

89.　Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

90.　Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

91.　In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

92.　Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

93.　Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

94.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

95.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## NCMEC and Cyber Tipline Reports

96.     The National Center for Missing and Exploited Children (commonly known as "NCMEC") was founded in 1984 to serve as a clearinghouse on issues related to missing and sexually exploited children. It is currently authorized by Congress to perform 19 programs and services to assist law enforcement, families, and professions find missing children, reduce child sexual exploitation, and prevent child victimization.

97.     As part of its functions, NCMEC administers the Cyber Tipline. The Cyber Tipline receives leads and tips from the public and Electronic Service Providers regarding

suspected crimes of sexual exploitation committed against children. Electronic Service Providers are required by law to report apparent child pornography to law enforcement via the Cyber Tipline. Analysts review these tips and refer them to the appropriate federal, state, and local law enforcement authorities. Many states utilize Internet Crimes Against Children (ICAC) task forces to serve as the intake organizations for the Cyber Tipline reports. These ICAC's review the Cyber Tipline reports received from NCMEC and assign them to the applicable law enforcement agencies. In Ohio, the ICAC in Cuyahoga County serves as this intake organization.

## FACTS SUPPORTING PROBABLE CAUSE

### Cyber Tipline Reports from MeWe

98.  As part of the investigation, I have learned that MeWe filed approximately nine reports to NCMEC's Cyber Tipline regarding suspected child pornography or child exploitation files that were located in nine separate MeWe accounts, all of which utilized the IP addresses of 98.29.147.70 to access the accounts. These nine reports were submitted during the approximate time period September 2019 through January 2020.

99.  In its reports, MeWe reported that a total of approximately two hundred nineteen (219) suspected child pornography or child exploitation files had been located in the nine accounts. MeWe provided these files to NCMEC as part of its Cyber Tipline reports.

100.  NCMEC forwarded MeWe's nine Cyber Tipline reports, along with the suspected child pornography or child exploitation files, to the Cuyahoga County ICAC for further investigation. I have obtained and reviewed MeWe's Cyber Tipline reports and the accompanying files from the Cuyahoga County ICAC as part of the investigation. Based on my review of the said files and my training and experience, I believe that at least approximately one hundred sixty-nine (169) of the two hundred nineteen (219) files submitted by MeWe depict child pornography. Below is a summary of the Cyber Tipline Reports:

a.  On or around September 16, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately three (3) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70. This account had a user name of "Juan Lastime" and was associated with the email address of **t6200081@gmail.com**. In addition to the IP address of 98.29.147.70, a number of other IP addresses had also been utilized to access the account – including 107.77.193.231 and 75.186.53.96. Based on my review of the files and my training and experience, I believe that approximately one (1) of the files submitted by MeWe depicts child pornography. This file is described as follows:

      i.     Screen Shot 2019-09-16 at 9.17.26 AM.png:  The file is an image that depicts what appears to be a nude adult Asian male holding a nude Asian female child.  The female child's legs are spread apart, exposing her vagina to the camera.

b.     On or around October 16, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately twenty-five (25) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70.  This account had a user name of "Juan Motime" and was associated with the email address of **wbob27286@gmail.com**.  In addition to the IP address of 98.29.147.70, the IP addresses of 107.77.193.231 and 75.186.53.96 had also been utilized to access the account.  Based on my review of the files and my training and experience, I believe that approximately twenty-two (22) of the files submitted by MeWe depict child pornography.  By way of example, one of these files is described as follows:

      i.     2570aea8-d7d3-4d13-8f65-d9b537d3e974.jpg:  The file is an image that depicts what appears to be an adult white female performing fellatio on the penis of what appears to be a nude pre-pubescent white male child.

c.     On or around October 31, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately forty-one (41) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70.  This account had a user name of "Juan Lesstime" and was associated with the email address of tj599427@gmail.com.  In addition to the IP address of 98.29.147.70, the IP address of 107.77.193.231 had also been utilized to access the account.  Based on my review of the files and my training and experience, I believe that approximately thirty-four (34) of the files submitted by MeWe depict child pornography.  By way of example, one of these files is described as follows:

      i.     Screenshot_2019-08-01-07-38-56~2.png:  The file is an image that depicts what appears to be an adult white male (whose face is not captured in the image) ejaculating into the mouth of a pre-pubescent white female child.

d.     On or around October 31, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately fifty-nine (59) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70.  The account had a user name of "Juan Goodtime" and was associated with the email address of js0867517@gmail.com.  In addition to the IP address of 98.29.147.70, the IP addresses of 107.77.193.231, 75.186.53.96, and 166.216.159.66 had also been utilized to access the account.  Based on my review of the files and my training and experience, I believe that approximately thirty-two (32) of the files submitted by MeWe depict child pornography.  By way

of example, one of these files is described as follows:

    i.    <u>158408250_2570aea8-d7d3-4d13-8f65-d9b537d3e974.jpg</u>: The file is an image that depicts what appears to be a nude pre-pubescent white male child lying on a bed. What appears to be an adult female is performing fellatio on the child's penis.

e.    On or around November 7, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately fifty-one (51) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70. This account had a user name of "Juan Twothree" and was associated with the email address of tt4883957@gmail.com. In addition to the IP address of 98.29.147.70, the IP addresses of 107.77.193.231, 75.186.53.96, 166.216.159.66, and 68.45.76.39 had also been utilized to access the account. Based on my review of the files and my training and experience, I believe that approximately forty-five (45) of the files submitted by MeWe depict child pornography. By way of example, one of these files is described as follows:

    i.    <u>159802708_iOS_image_upload%20(53).jpg</u>: The file is an image that depicts what appears to be a close-up of the nude vagina and anus of what appears to be a pre-pubescent white female child. What appears to be a penis is inserted into the child's anus.

f.    On or around November 26, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately nineteen (19) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70. The account had a user name of "David Dickson" and was associated with the email address of daviddickson335@gmail.com. In addition to the IP address of 98.29.147.70, the IP address of 75.186.53.96 had also been utilized to access the account. Based on my review of the files and my training and experience, I believe that approximately sixteen (16) of the files submitted by MeWe depict child pornography. By way of example, one of these files is described as follows:

    i.    <u>1415603038-VID_20141109_234029.mp4</u>: The file is a video that depicts a nude pre-pubescent white female child lying on a bed with her legs straddled. What appears to be an adult white male (whose face is not captured in the image) masturbates his penis over the child. He then partially inserts his penis into the child's vagina and ejaculates onto her vagina. The video is approximately fifty-nine (59) seconds in duration.

g.    On or around December 2, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately two suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of

98.29.147.70. The account had a user name of "David Jackson" and was associated with the email address of dave72042@gmail.com. In addition to the IP address of 98.29.147.70, the IP address of 107.77.193.231 had also been utilized to access the account. Based on my review of the files and my training and experience, I believe that approximately one of the files submitted by MeWe depicts child pornography. This file is described as follows:

    i.    image(501).jpg: The file is an image that depicts what appears to be a nude pre-pubescent white female child sitting on a couch with her legs straddled, exposing her nude vagina to the camera.

h.    On or around December 4, 2019, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately two (2) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70. This account had a user name of "Haywood Jablome" and was associated with the email address of **hjablome23@gmail.com**. In addition to the IP address of 98.29.147.70, the IP address of 107.77.194.149 had also been utilized to access the account. Based on my review of the files and my training and experience, I believe that approximately one (1) of the files submitted by MeWe depicts child pornography. This file is the same as the "image(501).jpg" file recovered from the dave72042@gmail.com MeWe account, as described above.

i.    On or around January 3, 2020, MeWe reported to NCMEC's Cyber Tipline that the company had discovered approximately seventeen (17) suspected child pornography or child exploitation files in a MeWe account that had utilized the IP address of 98.29.147.70. This account had a user name of "Captain Obvious" and was associated with the email address of **js8441868@gmail.com**. In addition to the IP address of 98.29.147.70, a number of other IP addresses had also been utilized to access the account – including 98.29.77.195. Based on my review of the files and my training and experience, I believe that approximately seventeen (17) of the files submitted by MeWe depict child pornography. By way of example, one of these files is described as follows:

    i.    Screenshot_2016-01-22-11-49-12-1.png: The file is an image that depicts what appears to be a toddler-aged white female child lying on her back. There are white tights pulled down around the toddler's ankles, but she is otherwise completely nude. The toddler's legs are straddled, exposing her nude vagina to the camera. A plastic bag is wrapped around the toddler's face and the word "Rape" is written on her stomach.

## Google LLC Cyber Tipline Reports

101.    As part of the investigation, I have learned that Google LLC filed approximately seven

Cyber Tipline reports regarding suspected child pornography or child exploitation files that were located in a Google account that had utilized the IP addresses of 98.29.147.70 and 107.77.193.231 to access the account (the same IP addresses utilized to access the nine MeWe accounts detailed above). This Google account was associated with the email address **southernman4501@gmail.com** and the **TARGET CELL PHONE**. These seven reports were made in or around November 2019. Each of these reports noted that the suspected child pornography or child exploitation files were located in the Google Photos account associated with the **southernman4501@gmail.com** email address.

102. In its reports, Google LLC reported that a total of approximately nine suspected child pornography or child exploitation files had been located in the Google Photos account associated with the **southernman4501@gmail.com** email address. Google LLC provided these files to NCMEC as part of its Cyber Tipline reports.

103. NCMEC forwarded Google LLC's seven Cyber Tipline reports, along with the suspected child pornography or child exploitation files, to the Ohio ICAC for further investigation. I have obtained and reviewed Google LLC's Cyber Tipline reports and the accompanying files from the Cuyahoga County ICAC as part of the investigation. Based on my review of the files and my training and experience, I believe that at least approximately seven of the nine files submitted by Google LLC depict child pornography. By way of example, two of these files are described as follows:

   a. 2019-11-11.png: The file is an image that depicts what appears to be a nude pre-pubescent white female child who is kneeling on a bed. What appears to be a nude adult white male is kneeling behind the child and inserting his penis into the child's anus or vagina. This file was reported by Google LLC to NCMEC's Cyber Tipline on or around November 14, 2019.

   b. 2019-11-11.png: The file is an image that depicts what appears to be a nude pre-pubescent white male child standing in a bedroom. What appears to be a nude pre-pubescent white female child is sitting on the floor in front of the male child, and she is performing fellatio of the male child's penis. This file was reported by Google LLC to NCMEC's Cyber Tipline on or around November 20, 2019.

Results of Subpoenas and Other Records

104. AT&T was identified as the service provider for the **TARGET CELL PHONE** (the telephone number associated with the **southernman4501@gmail.com** account). On or around January 8, 2020, an FBI investigator served an administrative subpoena to AT&T requesting subscriber information for this telephone number. Records received in response to the subpoena identified that the telephone number was a pre-paid account, and that no subscriber information was maintained by AT&T for the account user.

105.    Charter Communications was identified as the Internet Service Provider for the IP address of 98.29.147.70 (one of the IP addresses utilized to access all of the MeWe and Google accounts detailed above). On or around December 6, 2019 and February 24, 2020, an investigator from the Cuyahoga County ICAC served two subpoenas to Charter Communications requesting subscriber information for this IP address on two of the dates and times that it was used to access two of the MeWe accounts. Records received in response to the subpoenas identified that this IP address was subscribed to a RICHARD WELLER (hereinafter referred to as "WELLER") at 120 Sandhurst Street in Verona, Ohio. Records identified that this Internet account was activated on or around September 15, 2011.

106.    Charter Communications was also identified as the Internet Service Provider for the IP address of 98.29.177.195 (one of the IP addresses utilized to access the js8441868@gmail.com MeWe account detailed above). On or around February 24, 2020, an investigator from the Cuyahoga County ICAC served an administrative subpoena to Charter Communications requesting subscriber information for this IP address on one of the dates and times that it was used to access the js8441868@gmail.com MeWe account. Records received in response to the subpoena identified that this IP address was subscribed to WELLER's account at 120 Sandhurst Street in Verona, Ohio. Records further identified that this IP address had been assigned to WELLER's account since on or around December 5, 2019.

107.    AT&T Mobility was identified as the Internet Service Provider for the IP address of 107.77.193.231 (another one of the IP addresses utilized to access six of the MeWe accounts and the one Google account detailed above). The use of an IP address serviced by AT&T Mobility is consistent with someone using his or her cellular telephone's data plan to access the Internet. As detailed above, AT&T was identified as the service provider for the **TARGET CELL PHONE**. As such, it is reasonable to believe that a cellular telephone was utilized to access the MeWe and Google accounts detailed above on some occasions.

108.    Records from the Ohio Bureau of Motor Vehicles identified that WELLER utilized the address of 120 Sandhurst Street in Verona, Ohio on his current Ohio driver's license. Records from the Preble County, Ohio Auditor's Office identified that WELLER and his wife were listed as the current owners of the residence at 120 Sandhurst Street.

Results of Search Warrants:

109.    On or around January 22, 2020 and May 29, 2020, two federal search warrant were served to Sgroules Inc. requesting information associated with the MeWe accounts associated with the email addresses of daviddickson335@gmail.com, dave72042@gmail.com, tj599427@gmail.com, js0867517@gmail.com, tt4883957@gmail.com, hjablome23@gmail.com, and js8441868@gmail.com (the MeWe accounts associated with seven of the nine Cyber Tipline reports from Sgroules Inc.).

28

Records received in response to the search warrants identified that child pornography files were contained in all seven of the accounts. In five of the seven accounts, the account user distributed child pornography files to other MeWe users. A number of instances were identified in which the account user discussed his sexual interests in children and made comments indicating that he had engaged in sexually explicit conduct with children. Below is a summary of the records provided by Sgrouples Inc. for the seven MeWe accounts, including a few examples of comments made about the sexual exploitation of children:

tj599427@gmail.com:

a.  The account associated with the email address of tj599427@gmail.com had a MeWe user name of Juan Lesstime and a MeWe user ID of 5d80ca7e8deabf7250fbfe3e. The account was registered on or around September 17, 2019.

b.  A total of approximately two hundred fifty-seven (257) files were contained in the account. Based on my review of the files and my training and experience, I believe that at least approximately seventy-eight (78) of the images and approximately four (4) of the videos depict child pornography.

js0867517@gmail.com:

c.  The account associated with the email address js0867517@gmail.com had a MeWe user name of Juan Goodtime and a MeWe user ID of 5d95dd51182b702cccb57ddd. The account was registered on or around October 3, 2019.

d.  A total of approximately one hundred eighty-four (184) files were contained in the account. Based on my review of the files and my training and experience, I believe that at least approximately sixty-four (64) of the images and approximately nine (9) of the videos depict child pornography. Approximately one (1) of the images depicts an adult white male who appears to be WELLER.

e.  On or around October 9, 2019, the js0867517@gmail.com MeWe account user distributed child pornography files to one or more other users in a group chat. Below is an example of one of these files:

   i.  5d9e5122ea0672508399564d_2570aea8-d7d3-4d13-8f65-d9b537d3e974.jpg: The file is an image that depicts what appears to be a nude pre-pubescent white male child lying on a bed. What appears to be an adult white female is performing fellatio on the child's penis.

f.  The cover image and profile picture for the account were the same as those

contained in the tj599427@gmail.com account.

g.    On or around October 9, 2019, the js0867517@gmail.com MeWe account user commented in a group chat that he was sixty-two (62) years old (which matched WELLER's age at the time of this chat).

tt4883957@gmail.com

h.    The account associated with the email address tt4883957@gmail.com had a MeWe user name of Juan Twothree and a MeWe user ID of 5da84d7ef9c09b69a959c8ea. The account was registered on or around October 17, 2019.

i.    A total of approximately three hundred seventy-seven (377) files were contained in the account. Based on my review of the files and my training and experience, I believe that at least approximately one hundred fifty-seven (157) of the images and approximately twenty-four (24) of the videos depict child pornography. Approximately four (4) of the images depict an adult white male who appears to be WELLER.

j.    On or around November 4, 2019 and November 6, 2019, the tt4883957@gmail.com MeWe account user distributed child pornography files in chats with other users. Below is an example of one of these files, which was distributed on or around November 4, 2019:

     i.    5dc07a1ea8531406c3b4befe_20191021_190012.jpg: The file is an image that depicts what appears to be a nude pre-pubescent white female child lying on her back with her legs straddled above her head. The child's wrists are bound to her legs with purple straps. Another individual is touching the child's buttocks. After distributing this image, the tt4883957@gmail.com MeWe account user stated the following: "Like that", "Her little fuck hole is gaping", "My big dick will stretch it out for you".

k.    Below are examples of some of the comments made by the tt4883957@gmail.com MeWe account user that were indicative that he had engaged in sexually explicit conduct with children:

     i.    On or around October 22, 2019, the tt4883957@gmail.com MeWe account user stated the following: "Youngest I've messed with was 8", "The teen girls came on to me", "8yr old was a neighbor girl who stayed several nights as her mom worked".

     ii.    On or around November 5, 2019, the tt4883957@gmail.com MeWe

account user stated the following in a chat with another user: ""Fucked a 14yr old a couple years ago..so hot".

l.    The cover image and profile picture for the account were the same as those contained in the tj599427@gmail.com and js08675717@gmail.com accounts.

daviddickson335@gmail.com:

m.    The account associated with the email address daviddickson335@gmail.com had a MeWe user name of David Dickson and a MeWe user ID of 5dcd56c37c698c685e8130ab. The account was registered on or around November 14, 2019.

n.    A total of approximately one hundred ninety-one (191) files were contained in the account. Based on my review of the files and my training and experience, I believe that at least approximately sixty-three (63) of the images and approximately thirty-one (31) of the videos depict child pornography. Approximately two (2) of the images depict an adult white male who appears to be WELLER.

o.    The daviddickson335@gmail.com MeWe account user distributed child pornography files in two posts dated on or around November 18, 2019 and November 21, 2019. The daviddickson335@gmail.com MeWe account user also distributed child pornography files to other users in approximately six different chats dated during the approximate time period of November 15, 2019 through November 26, 2019. Below is an example of one of these files, which was distributed in a chat with another user on or around November 18, 2019:

i.    5dd2c64c20e50178c49d3065_20191030_184310.jpg: The file is an image that depicts what appears to be a pre-pubescent white female child performing fellatio on what appears to be a nude adult white male. Prior to sending this file, the daviddickson335@gmail.com MeWe account user stated the following: "Pretend you're little again as I fill u up", "7 yrs old as I sit you down on my engorged cock", "Stretching your tiny hole and splitting open your hymen", "All little girls deserve to be fucked by their daddy".

p.    Below is an example of comments made by the daviddickson335@gmail.com MeWe account user that were indicative that he had engaged in sexually explicit conduct with children:

i.    On or around November 5, 2019, the daviddickson335@gmail.com MeWe account user stated the following in a chat with another user: "She was a granddaughter of a friend of Mine", "Sucked her tits fingered her

31

ass and pussy and she jerked me off".

q. The daviddickson335@gmail.com MeWe account user made comments in chats with several other users indicating that he had a Mega[3] cloud storage account that he used to store child pornography files. By way of example, the daviddickson335@gmail.com MeWe account user told the following to another user on or around November 15, 2020: "I have some pre teen dog fucking vids somewhere", "One is a cute 9 or 10 year old who gets fucked good...dog cum runs outta her pussy", "I'll have to find them...theyre in my mega somewhere".

r. The profile picture for the account was the same as those contained in the tj599427@gmail.com, js08675717@gmail.com, and tt4883957@gmail.com accounts, but the cover image was different.

s. In a group chat, the daviddickson335@gmail.com MeWe account user commented that this account represented his thirteenth (13th) MeWe profile.

dave72042@gmail.com:

t. The account associated with the email address dave72042@gmail.com had a MeWe user name of Dave Jackson and a MeWe user ID of 5de10e4281b61c103a6639f3. The account was registered on or around November 29, 2019.

u. A total of approximately eighteen (18) files were contained in the account. Based on my review of the files and my training and experience, I believe that at least approximately one (1) of the images and approximately four (4) of the videos depict child pornography.

v. On or around November 29, 2019, the dave72042@gmail.com MeWe account user distributed child pornography files in a chat with another user. Below is an example of one of these files:

    i. 5de18fc1982ae86821cd0a88_DE1025B3-FC06-4214-807E-3465F613596B.MOV.mp4: The file is a video that depicts what appears to be a toddler-aged white female child who is wearing a shirt but is nude from the waist down. What appears to be an adult white male (whose face is not captured in the video) is having sexual intercourse with the child.

---

3 Mega is a cloud storage and file hosting service offered by Mega Limited, an Auckland, New Zealand-based company. Mega is known for its security feature where all files are end-to-end encrypted locally before they are uploaded. This encryption prevents anyone from accessing the files without knowledge of the pass key. Based on my training and experience, I know that individuals involved in child pornography offenses often store their child pornography files in Mega or other cloud storage accounts.

> The child is heard crying throughout the video. The video is approximately forty-four (44) seconds in duration.

w.   The profile picture and cover image for the account were the same as those contained in the tj599427@gmail.com, js08675717@gmail.com, and tt4883957@gmail.com accounts.

hjablome23@gmail.com:

x.   The account associated with the email address hjablome23@gmail.com had a MeWe user name of Haywood Jablome and a MeWe user ID of 5de65715daa0424186f9ad78. The account was registered on or around December 4, 2019.

y.   A total of approximately seven (7) files were contained in the account. Based on my review of the files and my training and experience, I believe that at least approximately one (1) of the images depicts child pornography. Approximately one (1) of the images depicts an adult white male who appears to be WELLER.

z.   The profile picture for the account was different from those contained in the tj599427@gmail.com, js08675717@gmail.com, tt4883957@gmail.com, daviddickson335@gmail.com, and dave72042@gmail.com accounts.

js8441868@gmail.com:

aa.  The account associated with the email address js8441868@gmail.com had a MeWe user name of Captain Obvious and a MeWe user ID of 5de8feeede6a91438293d94a. The account was registered on or around December 5, 2019.

bb.  A total of approximately one hundred fifty-four (154) files were contained in the account. Based on my review of the files and my training and experience, I believe that at least approximately forty-three (43) of the images and approximately fourteen (14) of the videos depict child pornography. Approximately four (4) of the images depict an adult white male who appears to be WELLER.

cc.  The js8441868@gmail.com MeWe account user distributed child pornography files in a post dated on or around December 21, 2019. The js8441868@gmail.com MeWe account user also distributed child pornography files to other users in approximately five (5) different chats dated during the approximate time period of December 19, 2019 through December 31, 2019. Below is an example of one of these files, which was distributed in a chat with another user on or around December 26, 2019:

        i. <u>5e051dee55599710ffd0b591.jpg</u>: The file is an image that depicts the nude groin area of what appears to be a pre-pubescent white female child. What appears to be two adult white males are inserting their penises into the child's vagina and anus.

dd.     Below are two examples of comments made by the js8441868@gmail.com MeWe account user that were indicative that he had engaged in sexually explicit conduct with children:

        i.     On or around December 27, 2019, the js8441868@gmail.com MeWe account user stated the following in a chat with another user: "I've had 3 adventures with 8yr olds", "I consider myself lucky".

        ii.    On or around December 27, 2019, the js8441868@gmail.com MeWe account user stated the following in a chat with another user: "I've fucked a 13yr old before".

ee.     The js8441868@gmail.com MeWe account user exchanged chat messages with at least six other users who, based on the context of the conversations, appeared to be minors. The js8441868@gmail.com MeWe account user appeared to solicit some of these other users for nude photographs and talked about the possibility of engaging in sexually explicit conduct with them. Below are brief examples of two of these chats:

        i.     During the approximate time period of December 9, 2019 through December 31, 2019, the js8441868@gmail.com MeWe account user exchanged messages with another user who appeared to be a minor. The js8441868@gmail.com MeWe account user's comments to this other user included the following:

> "You're the sexiest 15yr old I've met!:smiling_face_with_3_hearts:
> "No wonder the boys all want you"
> "It means alot you sending me these pics
> . . . . .
> "A sexy young girl who's willing to listen and learn and can look past the age and some wrinkles and grey hair...our dicks work till the day we die"
> "I'd love to teach you... Show you"
> "Sucking is another aspect an older man can teach you"
> "Keep sending pics like that... And you'll get something of mine enlarged!:smiling_imp::eggplant::ocean"
> "What? It's true..youre very sexy"

"Ho Lee fuk! Those tits are absolutely delicious looking! Oh I'd love to cum all over them"

ii.    During the approximate time period of December 9, 2019 through January 3, 2019, the js8441868@gmail.com MeWe account user exchanged messages with another user who appeared to be a minor. The js8441868@gmail.com MeWe account user's comments to this other user included the following:

"I mostly have preteen vids and pics"
"I like em young"
"You're very developed for 16"
"I'll give you an example on timer"
"Got pics of that!?:smirk:"
"I love any nudes from girls your age or younger"
. . . . .
"I can kinda see ur pussy"
"Cool"
"You'll give me something to look forward to to Jack off"

ff.    The js8441868@gmail.com MeWe account user made comments in chats with several other users about his apparent sexual preferences in children. By way of example, the js8441868@gmail.com MeWe account user told the following to another user on or around December 29, 2019: "I've sent most the older pics I have… I mostly like girls..8-11", "But any underage turns me on".

gg.    The js8441868@gmail.com MeWe account user made comments in chats with several other users indicating that he had Mega and Wickr[4] accounts, and that he used these accounts for his child pornography activities. By way of example, the js8441868@gmail.com MeWe account user told the following to another user on or around December 27, 2019: "So I get on mega and wickr and jack off to kiddy porn" . . . "I even cum to child birth vids". Also for example, the js8441868@gmail.com MeWe account user told the following to another user on or around December 19, 2019: "I prefer wickr or mega for hardcore shit", "General nudes and stuff are ok here", That's why I put the preteen stuff on a timer…it disappears".

hh.    On or around December 9, 2019 and December 21, 2019, the js8441868@gmail.com MeWe account user made comments in messages exchanged with other users that he was sixty-two (62) years old (which matched WELLER's age at the time of these chats). He also commented that his name was

---

4 Wickr is an instant messenger application administered by Wickr Inc., a company based in San Francisco, California. The application allows users to exchange end-to-end encrypted and content-expiring messages, photographs, videos, and other file attachments.

"Rich" (a common nickname for WELLER's first name) in a chat he exchanged with another user on or around December 15, 2019.

    ii.    On or around January 3, 2020, the js8441868@gmail.com MeWe account user made the following comment in a message exchanged with another user: "I have no pics of family on this phone…this phone only for porn and sex chat".

        i.    Based on this comment, it appears that the account user utilized one cellular telephone for his general telephone activities and another cellular telephone to view pornography (including child pornography) and to communicate with others about sexually explicit topics (including the sexual exploitation of children).

        ii.    Based on my training and experience, I know that individuals involved in child pornography offenses sometimes utilize separate cellular telephones to conduct their illicit activities as a means to conceal their criminal conduct from their family members, friends, and/or law enforcement officers. Some individuals go to great lengths to conceal these telephones when they are not being used.

    jj.    The profile picture for the account was the same as that contained in the hjablome23@gmail.com account.

110.    On or around January 22, 2020 and May 29, 2020, two federal search warrants were served upon Google LLC requesting information associated with the Google accounts **southernman4501@gmail.com**, daviddickson335@gmail.com, dave72042@gmail.com, tj599427@gmail.com, js0867517@gmail.com, tt4883957@gmail.com, hjablome23@gmail.com, and js8441868@gmail.com (the Google accounts associated with seven of the Cyber Tipline reports from MeWe and the seven Cyber Tipline reports from Google LLC). Records received in response to the search warrant provided the following information:

    a.    The **southernman4501@gmail.com** account was opened on or around March 1, 2018 in the name of "David Dixon". The **TARGET CELL PHONE** was the telephone number associated with the account. The account was disabled on or around November 13, 2019.

    b.    Over nine hundred (900) email messages were saved in the **southernman4501@gmail.com** account. Most of these emails were received from email addresses associated with various businesses and websites. Some of the messages provided various notifications regarding the users' accounts, and some appeared to be "spam" or "junk" messages[5]. However, the following email

---

    5 Spam emails, also referred to as junk emails, typically refer to unsolicited messages sent by various businesses, websites, or other providers in bulk.

messages were noted:

i. A number of messages were saved in the account that were received from email addresses associated with the Facebook and Instagram websites. These email messages provided various notifications about Facebook and Instagram accounts that were associated with the **southernman4501@gmail.com** email address. The messages from the email address associated with the Instagram website identified that the user name of the Instagram account was **southernman4501**.

ii. One of the emails saved in the account was sent by the **southernman4501@gmail.com** account user to an email address associated with a business. The email message was signed "Rich Weller" and "240-609-9375" (the **TARGET CELL PHONE**).

c. Google LLC provided the contents of the Google Photos account associated with the **southernman4501@gmail.com** email address. This Google Photos account included approximately eleven (11) images depicting child pornography – some of which were the same ones as those submitted by Google LLC in the Cyber Tipline reports. These approximately eleven (11) images were uploaded to the Google Photos account on or around November 11, 2020.

d. The tj599427@gmail.com account was opened in the name of "travis junior" on or around September 17, 2019 (the same date that the associated MeWe account was opened). The IP address of 98.29.147.70 (the IP address utilized to access the nine MeWe accounts detailed above and that is subscribed to WELLER) was utilized to access the account on the day that it was opened, and there were no additional logins to the account thereafter. The only email messages saved in the account were messages from email addresses associated with the Google and MeWe websites, and these messages provided the user with notifications regarding his Google and MeWe accounts.

e. The js086517@gmail.com account was opened in the name of "John Smith" on or around October 3, 2019 (the same date that the associated MeWe account was opened). The IP address of 98.29.147.70 (the IP address utilized to access the nine MeWe accounts detailed above and that is subscribed to WELLER) was utilized to access the account on the day that it was opened, and there were no additional logins to the account thereafter. The only email messages saved in the account were messages from email addresses associated with the Google and MeWe websites, and these messages provided the user with notifications regarding his Google and MeWe accounts.

f. The tt4883957@gmail.com account was opened in the name of "Tom Tom" on or around October 17, 2019 (the same date that the associated MeWe account was

opened). The IP address of 98.29.147.70 (the IP address utilized to access the nine MeWe accounts and that is subscribed to WELLER) was utilized to access the account on the day that it was opened, and there were no additional logins to the account thereafter. The only email messages saved in the account were messages from email addresses associated with the Google and MeWe websites, and these messages provided the user with notifications regarding his Google and MeWe accounts.

g.   The daviddickson335@gmail.com account was opened in the name of "david dickson" on or around November 14, 2019 (the same date that the associated MeWe account was opened). The IP address of 98.29.147.70 (the IP address utilized to access the nine MeWe accounts and that is subscribed to WELLER) was utilized to access the account on the day that it was opened, and there were no additional logins to the account thereafter. The only email messages saved in the account were messages from email addresses associated with the Google and MeWe websites, and these messages provided the user with notifications regarding his Google and MeWe accounts.

h.   The dave72042@gmail.com account was opened in the name of "Dave Jackson" on or around November 29, 2019 (the same date that the associated MeWe account was opened). The IP address of 98.29.147.70 (the IP address utilized to access the nine MeWe accounts and that is subscribed to WELLER) was utilized to access the account on the day that it was opened, and there were no additional logins to the account thereafter. The only email messages saved in the account were messages from email addresses associated with the Google and MeWe websites, and these messages provided the user with notifications regarding his Google and MeWe accounts.

i.   The hjablome23@gmail.com account was opened in the name of "Heywood Jablome" on or around December 3, 2019 (one day before the associated MeWe account was opened). The IP address of 98.29.147.70 (the IP address utilized to access the nine MeWe accounts and that is subscribed to WELLER) was utilized to access the account on the day that it was opened, and there were no additional logins to the account thereafter. The only email messages saved in the account were messages from email addresses associated with the Google and MeWe websites, and these messages provided the user with notifications regarding his Google and MeWe accounts.

j.   The js8441868@gmail.com account was opened in the name of "John Smith" on or around December 5, 2019 (the same date that the associated MeWe account was opened). The IP address of 98.29.147.70 (the IP address utilized to access the nine MeWe accounts and that is subscribed to WELLER) was utilized to access the account on the day that it was opened, and there were no additional

logins to the account thereafter. The only email messages saved in the account were messages from email addresses associated with the Google and MeWe websites, and these messages provided the user with notifications regarding his Google and MeWe accounts.

111. Based on the information detailed above, it appears that the davidickson335@gmail.com, dave72042@gmail.com, tj599427@gmail.com, js0867517@gmail.com, tt4883957@gmail.com, hjablome23@gmail.com, and js8441868@gmail.com Google accounts were created solely to open the associated MeWe accounts. Based on my training and experience, I know that individuals who utilize social media accounts to trade and possess child pornography often create fictitious email accounts and utilize alias account names to open their accounts. The fictitious accounts and aliases are used as a means to conceal the users' identities from law enforcement officers.

112. The Cyber Tipline reports associated with the **t6200081@gmail.com** and **wbob27283@gmail.com** MeWe accounts were not known to me at the time that the above detailed search warrants were served to Sgrouples Inc. and Google LLC. As such, authority to search these accounts was not requested in the previous search warrants.

113. On or around January 22, 2020, a federal search warrant was served upon AT&T requesting information associated with the **TARGET CELL PHONE** (the telephone number associated with the **southernman4501@gmail.com** account) – including historical cell site and cell sector information. Records received in response to the search warrant provided the following information:

    a.    The **TARGET CELL PHONE** was a prepaid account in which no subscriber or user information was maintained by AT&T.

    b.    The device currently utilizing the **TARGET CELL PHONE** was an LG cellular telephone bearing model number LM-X210APM.

    c.    The cell site and cell sector information for the **TARGET CELL PHONE** identified that it was regularly in the area of WELLER's residence at 120 Sandhurst Street in Verona, Ohio during the approximate time period of January 1, 2019 through January 22, 2020.

### Execution of Search Warrant at WELLER's Residence

114. On or around March 11, 2020, a search warrant was authorized by the Preble County, Ohio Court of Common Pleas for the search of a residence located at 120 Sandhurst Street in Verona, Ohio. Deputies of the Preble County Sheriff's Office executed this search warrant on or around March 11, 2020. An individual who identified himself as being WELLER's half-brother (hereinafter referred to as "Adult Male A") was the only

individual present when deputies arrived to execute the warrant. Adult Male A advised that he lived at the residence with WELLER and WELLER's wife. Approximately seventeen (17) electronic devices were seized pursuant to the search warrant.

    a.    It was noted that an LG cellular telephone bearing model number LM-X210APM (the device utilized to access the **TARGET CELL PHONE**) was not seized pursuant to the search warrant.

115.    While deputies were executing the search warrant, Detective Paul Plaugher telephonically contacted WELLER and requested that he return to the residence. WELLER thereafter returned to the residence and agreed to be interviewed after being advised of his Miranda rights. It should be noted that at the time the search warrant was executed, deputies of the Preble County Sheriff's Office were only aware of the Cyber Tipline report submitted by MeWe for the js8441868@gmail.com account. Deputies were not aware of the FBI's investigation or the results of the search warrants served to Sgrouples Inc. and Google LLC. As such, deputies did not question WELLER about the use of the other MeWe or Google accounts. In summary, WELLER provided the following information during the interview:

    a.    WELLER initially denied any involvement in viewing child pornography. However, he later admitted that he had seen child pornography files in a group chat on MeWe on one occasion. WELLER described the files he had seen as being pictures of children involved in sexual acts with adults. WELLER claimed that he had only accessed a MeWe account on one or two days.

    b.    WELLER denied that he solicited child pornography files from others or that he distributed child pornography files to any other users. WELLER also denied that he downloaded the child pornography files that he viewed on MeWe.

    c.    WELLER stated that he used a cellular telephone to access the MeWe chat room and to view the child pornography files. WELLER stated that he had disposed of this cellular telephone "weeks ago" because its screen was broken.

    d.    When asked if deputies would find child pornography on any devices in the residence, WELLER responded "I don't think so" and then "I have no clue". WELLER stated that other than his cellular telephone, most of the electronic devices in the residence had been used by multiple members of his family.

<u>Additional Subpoena to AT&T</u>

116.    As detailed above, an LG cellular telephone bearing model number LM-X210APM was utilized to access the **TARGET CELL PHONE**, but no such device was seized pursuant to the search warrant. Also as detailed above, the user of the js8441868@gmail.com MeWe account indicated that he utilized one cellular telephone for his general telephone

activities and another cellular telephone for his pornography activities.

117.    On or around May 21, 2020, an administrative subpoena was served to AT&T requesting transactional records for the **TARGET CELL PHONE** for the time period of March 1, 2020 through May 21, 2020 (the time period shortly before the search warrant was executed at WELLER's residence and continuing thereafter). Records provided by AT&T in response to the subpoena provided the following information:

   a.    No completed telephone calls were made during the approximate time period of March 1, 2020 through May 21, 2020. However, approximately fifty-two (52) incoming and outgoing text messages were exchanged with various other telephone numbers during the time period of March 1, 2020 through March 10, 2020 (one day prior to the execution of the search warrant at WELLER's residence).

   b.    During the approximate time period of March 1, 2020 through March 11, 2020, data was consistently accessed on the **TARGET CELL PHONE**. Given the lack of telephone calls and the relatively small number of text messages, these data sessions are consistent with someone utilizing the **TARGET CELL PHONE** to access the Internet and/or Internet-based applications. The last data session occurred at approximately 4:52 p.m. on March 11, 2020.

      i.    Deputies from the Preble County Sheriff's Office arrived at WELLER's residence to execute the search warrant on March 11, 2020 at approximately 4:49 p.m. As detailed above, WELLER was not home when deputies arrived. Detective Plaugher called WELLER and requested that he return to the residence. As such, it is reasonable to believe that WELLER had an opportunity to abandon, dispose of, or conceal the **TARGET CELL PHONE** before returning to the residence.

   c.    No completed telephone calls, text messages, or data sessions transpired on the **TARGET CELL PHONE** after March 11, 2020.

   d.    An LG cellular telephone bearing model number LM-X210APM continued to be the device that utilized the **TARGET CELL PHONE** up until the last data session conducted on or around March 11, 2020.

<u>Identification of Additional Accounts</u>

118.    On or around January 7, 2020, an FBI investigator searched publicly available information on the Facebook and Instagram websites for any accounts associated with the email address **southernman4501@gmail.com**. The investigator found that there was in fact both Facebook and Instagram accounts associated with this email address. Consistent with the email messages recovered from Google LLC for the

**southernman4501@gmail.com** account, I also located an Instagram account with an account name of **southernman4501** on the Instagram website.

119.    Also on or around January 7, 2020, an FBI investigator searched publicly available information on the Snapchat application for any Snapchat accounts associated with the **TARGET CELL PHONE**. The investigator located an account with a user name of **abalderson1**.

### Evidence Available in Email and Social Media Accounts

120.    Based on my training and experience, I am aware that individuals involved in child exploitation schemes often communicate with others involved in similar offenses about their victims and sexual activities via e-mail, social media accounts, and online chat programs. I have seen examples of cases where such individuals have communicated with other child predators about their sexual fantasies and prior sexual activities with juveniles. I have also seen cases where such individuals have communicated with others about their remorse and regret for their activities. Both types of communications provide material evidence in child exploitation cases in that they provide admissions of guilt.

121.    Also in my experience, individuals involved in child exploitation schemes often utilize email, social media, and online chat programs as a means to locate and recruit victims. They then use the chat functions on these and other websites, as well as email accounts, to communicate with their victims. Such communications provide a means of anonymity to protect the subjects' identities and to conceal the communications from the victims' parents.

122.    Based on my training and experience, I know that individuals involved in child pornography offenses often obtain and trade images with each other via a variety of means, including email, social media accounts, photo sharing services, and online chat programs. Individuals also often attempt to obtain child pornography from a variety of sources, including from those with whom they communicate via email, social media sites, Internet chat programs, Internet bulletin boards, Internet Peer-to-Peer file sharing programs, Internet websites, and other sources. I have also seen a number of cases in which individuals email files containing child pornography to themselves – either from one email account to another or from and to the same email account – in order to transfer the files from one electronic device to another.

123.    Based on my training and experience, one or more aliases are often used by individuals involved in child exploitation offenses as a means to avoid detection from law enforcement. It is not uncommon for such offenders to create multiple identities, sometimes involving different ages and genders. Offenders sometimes fictitiously portray themselves as juveniles as a means to gain trust and rapport with victims.

Offenders also sometimes obtain photographs of other individuals from the Internet to use as their profile pictures and/or to send to the victims.

124.    Based on my training and experience, I know that many social media accounts, Internet websites, and telephone providers require users to provide their email accounts when registering for the accounts. The social media and Internet account providers then send the users various notifications regarding messages from other users, information accessed by users, information available by the websites, and other information. Telephone providers often send bills to their customers via email. These messages can provide material evidence in cases involving child exploitation offenses because they help in identifying what social media, Internet accounts, and telephone account that were utilized by the subjects to communicate with other subjects and victims and what accounts were utilized by the subjects to find child pornography. In addition, the messages help in identifying the identities of other subjects and victims.

125.    Also as noted above, email providers maintain various subscriber and user information that their users provide when registering for its accounts. Some email providers also require payment for certain services or features. Such information is materially important in cases where online accounts are utilized to trade child pornography, as this information can help in confirming the identities of the individuals using the accounts and committing the offenses.

126.    Furthermore, any communications to or from the aforesaid email accounts (including communications with adults or other third parties) may be materially relevant to the investigation, as these communications may help to corroborate the identity of the MeWe and Google account user.

127.    Email providers maintain various logs of IP addresses utilized to access the accounts. The IP information is again materially important in child pornography investigations. This information helps in identifying the subjects and the locations where their computer devices are located.

### Evidence Sought in Other Google Accounts

128.    Google LLC has the ability to maintain information associated with the Web and Application history of its users. Such information is materially relevant in child exploitation investigations, as it may help in identifying websites used by subjects to obtain child pornography and locate victims.

129.    Google Drive and Google Photos provide users with cloud computing and online file storage (as detailed above) and photo storage services. In my experience, individuals with large collections of child pornography may utilize cloud computing and online storage accounts as a means to store their files after their hard drives become full. In

43

addition, individuals utilize these services as a means to conceal their files from others, including law enforcement.

130. Google Android Backup provides users with the ability to backup data on their cellular telephones and other electronic devices. Such data can be materially relevant in cases in which cellular telephones and other electronic devices are used to commit child exploitation offenses, as this data may provide historical records of their criminal activities that are no longer saved on the devices.

## Evidence Available in Searches of Cellular Telephone Records

131. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

132. Based on my training and experience, I know that AT&T can collect cell-site data about the **TARGET CELL PHONE**. I also know that AT&T collects data referred to as "NELOS" data. NELOS data is like a historical "ping" wherein the approximate location of the phone is measured by the network then recorded in the records as a latitude, longitude, and range of uncertainty. Furthermore, I know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

133. Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in

their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELL PHONE**'s user or users and may assist in the identification of co-conspirators and/or victims.

134.  Based on my training and experience, I know that cell tower and sector information can be materially relevant in investigations involving child exploitation offenses. This information provides evidence of the travels undertaken by the subject and victim when meeting with one another. Data regarding the subjects' and victims' whereabouts obtained from cell site information can corroborate their statements and provide evidence of the locations of the criminal activities.

135.  As detailed above, there is probable cause to believe that the user of the MeWe and Google accounts detailed above utilized his or her MeWe and Google accounts, as well as the **TARGET CELL PHONE**, to possess, receive, and distribute child pornography. Cell site and cell sector information for the **TARGET CELL PHONE** on the dates and times that the child pornography files were possessed, received, and distributed and discussed the sexual exploitation of children could be materially relevant in identifying and/or corroborating the locations where these activities transpired.

136.  Based on my training and experience, I know that location information from cellular telephones can be materially relevant in investigations involving child exploitation offenses. This information provides evidence of the travels undertaken by the subject when meeting with possible victims. Data regarding the subjects' whereabouts as obtained from location information can corroborate statements made by the subjects and victims and provide evidence of the locations where the criminal activities took place. Furthermore, data regarding the subjects' whereabouts as obtained from the location information can lead to the identification of the places where computer devices used in furtherance of the crime may be present.

137.  As detailed above, information obtained pursuant to the investigation indicates that the **TARGET CELL PHONE** was concealed from law enforcement officers at the time that the search warrant was executed at WELLER's residence. Cell site and cell sector information for the **TARGET CELL PHONE** before, during, and after the search warrant may provide material evidence regarding the location of the telephone during these times and where the device was ultimately disposed of, abandoned, or concealed.

138.  Also based on my training and experience, I know that subscriber information and billing records maintained by telephone providers provide material evidence of criminal offenses. Such information is significant in that it helps in determining the identities of the users of the telephones.

<u>Conclusion Regarding Use of Accounts:</u>

139. Based on all of the information detailed above, there is probable cause to believe WELLER is the user of the following accounts:

    a.     The MeWe accounts associated with the email addresses daviddickson335@gmail.com, dave72042@gmail.com, tj599427@gmail.com, js0867517@gmail.com, tt4883957@gmail.com, js8441868@gmail.com, hjablome23@gmail.com, **t6200081@gmail.com,** and **wbob27283@gmail.com;**

    b.     The email accounts **southernman4501@gmail.com,** daviddickson335@gmail.com, dave72042@gmail.com, tj599427@gmail.com, js0867517@gmail.com, tt4883957@gmail.com, **js8441868@gmail.com,** hjablome23@gmail.com, **t6200081@gmail.com,** and **wbob27283@gmail.com;**

    c.     The Instagram and Facebook accounts associated with the email address **southernman4501@gmail.com**;

    d.     The Snapchat account containing the user name **abalderson1**; and

    e.     The **TARGET CELL PHONE**.

140. Also based on the information detailed in the Affidavit, there is probable cause to believe the following:

    a.     WELLER utilized the above noted MeWe accounts, as well as the **southernman4501@gmail.com** Google account, to distribute, receive, and possess child pornography.

    b.     The MeWe, Google, Facebook, Instagram, and Snapchat accounts detailed above contain evidence of WELLER's child pornography activities and/or the identity of the user of the various accounts.

    c.     The historical cell site records for the **TARGET CELL PHONE** contain evidence of the locations of WELLER's child pornography activities as well as the location where WELLER abandoned, disposed of, or concealed the device.

## ELECTRONIC COMMUNICATIONS PRIVACY ACT

141. I anticipate executing the requested warrants for the listed accounts under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Sgrouples Inc., Google LLC, Snap Inc.,

Facebook Inc., and AT&T to disclose to the government copies of the records and other information (including the contents of communications) particularly described in Section I of Attachments B-1 through B-6. Upon receipt of the information described in Section I of Attachments B-1 through B-6, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 through B-6.

## CONCLUSION

142. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law; including violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1), 2252A(a)(5)(B) and (b)(1), 2252(a)(2)(B) and (b)(1), and 2252A(a)(2) and (b)(1), are present in the information associated with the above noted accounts (as described in Attachments A-1 through A-6).

143. I, therefore, respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in Attachments B-1 through B-6.

144. Because the warrants for the accounts described in Attachments A-1 through A-6 will be served on Sgrouples Inc., Google LLC, Snap Inc., Facebook Inc., and AT&T, who will then compile the requested records at times convenient to those entities, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Special Agent Andrea R. Kinzig
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me this 27th of July 2020

Sharon L. Ovington
**United States Magistrate Judge**

47